Filed 8/26/25  In re A.M. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re A.M. a Person Coming Under the Juvenile Court Law. | B338724 |
| | (Los Angeles County Super. Ct. Nos. 21CCJP04268, 21CCJP04268F) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br>            Plaintiff and Respondent. <br>            v. <br><br> E.R., <br><br>            Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Philip L. Soto, Judge.  Dismissed.

Christopher Blake, under appointment by the Court of Appeal for Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel,  Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

Father E.R. appeals from the juvenile court's order exercising jurisdiction over his daughter, A., pursuant to Welfare and Institutions Code section 300, subdivisions (b) and (j).[1]  He argues that the court lacked jurisdiction because he complied with the court's orders regarding mental health treatment for 15-year-old A. and there was no evidence he would pose a continued risk of harm to the child. Respondent Los Angeles County Department of Children and Family Services (DCFS) contends the appeal is moot, as the juvenile court subsequently terminated jurisdiction with a custody order to father.  We agree that the appeal is moot.  We therefore dismiss the appeal.

## BACKGROUND

### I.  Petition

Father and mother, V.M., have one child together, A., born in 2008. Mother has several other children with other partners.[2]  According to father, A. had been living with him since she was one and a half years old.

In October 2023, DCFS received a report that A. was at a psychiatric treatment facility on an involuntary hold.  The reporting party stated that A. was having suicidal ideations and that father was not supportive of A.'s mental health treatment.  The case manager at the treatment center stated that father claimed A. was just "acting out."  A DCFS children's social worker (CSW) made multiple attempts to contact father between October and early December, 2023, including sending letters and emails, leaving voicemails, and making visits to father's home, all without response.

A CSW met with A. at her high school on October 20, 2023.  A. reported that she had been hospitalized because she threatened to kill herself at

---

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     A. is the only child at issue in this dependency proceeding.  Mother is not a party to this appeal.

school. She had been struggling with depression for the past four years. She also cut herself on the wrist with a razor two to three months earlier; she did not tell anyone about it at the time and denied other self-harm since then. A. reported that she had attended only two therapy sessions. She stated that she would like to try psychotropic medication, but she could not convince father to allow it. She admitted to generally feeling overwhelmed and said she wanted help. A. wished father "knew more about mental health."

A.'s school psychologist told DCFS that A. had been placed on a psychiatric hold after she reported thoughts of dying and killing herself, and stated that father made her feel that she would be better off dead. The psychologist reported that A. had come into the office very upset. A. was running late for school and had been texting with father. She became overwhelmed with the conversation and told father she was thinking about running into the street. Father replied by text that if she did, it would be less of a burden for him. A. told the counselor that she had difficulty coping with the situation and had strong urges to hurt herself. The psychologist told DCFS that she had not spoken with father, despite the school's attempts to reach out. The school could not reach father when A. was hospitalized and he did not communicate about a safety plan upon A.'s return to school.

A.'s school counselor told DCFS that her biggest concern was that A. needed to be assessed for an Individualized Education Plan (IEP). The school had tried multiple times to get father involved in the process, including asking him to attend meetings and sign paperwork, but he had not done so. A. originally qualified for an IEP three years ago in middle school, but father had never accepted the proposed services.

On November 16 and November 29, 2023, A. told the CSW that father had not yet enrolled her in therapy or returned the signed IEP paperwork. A. admitted feeling angry and sad. She said she last cut her wrist with a razor about a month ago. When she would cut herself in sixth grade, father would take her phone away, blaming the phone for her behavior. A. also admitted to trying to hang herself with a skirt in the closet in sixth or seventh grade.

3

She reported being stressed about school and her grades and said that father talked to her every day about her grades and needing to do better.

At the end of November, DCFS tried to reach father through paternal grandmother. Paternal grandmother stated that father told her A. was seeing a therapist, that he was taking care of A.'s needs and there was no need for further follow-up, so father would not be calling the CSW. DCFS confirmed that father applied for support from an adolescent mental health center on December 4, 2023.

DCFS finally met with father in an unannounced visit to his home on December 8, 2023. Father stated he had been busy with work, that he had signed the IEP paperwork and A. was in therapy. Father cut the meeting short, stating he had to leave for work. A few days later, the CSW met with father again. He stated that his medical insurance had changed on November 30, which delayed enrolling A. in therapy. Father said that A. seemed "okay" and happy. Regarding A.'s hospitalization, father stated that A. was in distress because her grades were slipping. He also felt she was distracted by a relationship. He did not believe A. was depressed. Father was unhappy about DCFS's attempts to contact him, stating he was being harassed. He rejected DCFS's suggestion to consider a voluntary family maintenance plan.

DCFS filed a dependency petition in December 2023 on behalf of A. under section 300, subdivisions (b)(1), (c), and (j). In count b-1, the petition alleged that A. suffered from "mental and emotional problems, including depression, self-injurious behaviors, suicidal ideation, and a suicide attempt," and that A. had been involuntarily hospitalized on two occasions for treatment of her psychiatric condition. The petition further alleged that father failed to obtain necessary mental health treatment for A., including medication, failed to consent to an IEP assessment at school, and "repeatedly failed to make himself available to school staff to address the child's mental health, which also negatively impacted the child's educational needs." Count c-1 contained the same allegations, and further alleged that father emotionally abused A. by suggesting that she was a burden in response to her threat to run into traffic.

4

The petition alleged in counts b-2 and j-1 that mother had a history of substance abuse, resulting in dependency proceedings involving A.'s half-siblings.  The petition further alleged that mother's alcohol abuse endangered A.  The court ordered A. to remain living with father.

At the January 2024 detention hearing, the court found father was A.'s presumed father.  The court found a prima facie case for jurisdiction over A. under section 300.  The court ordered A. released to father, with monitored visitation for mother.

## II.    Jurisdiction/Disposition Report

In its February 2024 jurisdiction/disposition report, DCFS stated that A. reported her situation had improved because she was getting mental health treatment.  She stated she did not feel she had been neglected by father, and they were now in family therapy together.  Although previously father did not know how to communicate with A. and thought A. was pretending to have mental health problems, which was upsetting to A., now A. stated she was talking more to father and expressing herself.  A. could not recall the last time she had contact with mother.

A. began treatment in a mental health program at the end of December 2023, including meeting with a psychologist.  The school psychologist reported that father had attended an IEP team meeting in early February 2024.  She also stated that father did not appear to be minimizing A.'s mental health issues during the meeting but seemed focused on A.'s needs.  A.'s grade point average for fall 2023 was 2.05, with multiple failing grades.

DCFS opined in the report that although father had "recently shown an effort to follow through with services" for A.'s mental health needs, he "lacks insight into the child's needs and will benefit from psychosocial education." DCFS did not believe a voluntary family plan would be appropriate given A.'s needs and father's lack of compliance during most of the investigative period. DCFS recommended allowing A. to remain living with father but continuing court oversight to ensure that A. and father participated in services.

After multiple attempts by DCFS to reach father, he agreed to a meeting on February 10, 2024.  Father expressed frustration with the time

required to participate in an open dependency case. He reported that A. was currently taking prescribed medication for her mental health and was responding well. He denied that A. was offered an IEP in middle school and denied the allegations of mental abuse. He stated that he was not aware of A.'s suicidal feelings and that A. seemed fine and did not appear depressed. He denied telling A. she could not have mental health services and stated he could not participate in most of the IEP meetings because of his work schedule.

DCFS confirmed that A. participated in mental health services briefly during the summer of 2021, but the agency closed the case after it could not get in touch with father and the family failed to attend several appointments. A. was re-enrolled in October 2023, following her hospitalization, but those services were terminated a few months later after A. stated she did not want to miss school for sessions and the family stated it would look for other services outside of school.

## III. Adjudication and disposition

The adjudication hearing, initially set for February 22, 2024, was continued to May 2024. In a March last-minute information, DCFS reported that it had learned from A.'s mental health services program that A. was no longer there. Father told DCFS that A. was "doing okay" and was in a residential treatment program at her request. He denied that A. had experienced any recent trauma or self-harm, she "only wanted more services," so she was transferred to the facility on March 16, 2024. When asked why he had not informed DCFS, father stated that he was busy with A.'s care and the CSWs were "the last people he wanted to speak to." Father became agitated, claimed that DCFS did not help and was a "money grab," and blamed DCFS and the court for increasing A.'s anxiety.

The CSW learned that A. had been hospitalized on February 27, 2024, after she disclosed suicidal thoughts and a plan to her therapist. Father took A. to residential treatment after she was discharged from the hospital. The CSW noted that she spoke to father on March 7 about a visit and father stated only that they were going to be out of town that week. The CSW

visited A. at the treatment center on March 23, 2024. A. did not want to discuss her hospitalization and became angry, stating she wanted the dependency case to close and if it did not, she would kill herself. DCFS expressed continued concern about A.'s mental health, father's lack of honesty with DCFS, and father's minimization of A.'s mental health needs.

In a May 2024 last-minute information, DCFS provided an assessment from the residential treatment program, including statements by father that he was aware of A.'s mental health and school challenges as early as middle school, including self-harming. These statements indicated father's knowledge of A.'s issues much earlier than he had indicated to DCFS, but father failed to enroll A. in services until DCFS's involvement in late 2023. A. also disclosed substance use since age 12 and six previous suicide attempts. The treatment program assessed A. as "high risk."

As of May 2024, A. had returned to her prior outpatient mental health treatment program. She was receiving group and individual therapy, plus weekly family therapy. Father had not made himself available to speak to or meet with DCFS.

In a last-minute information on May 30, DCFS reported that A. planned to re-enroll at her prior high school for the next school year. The school stated that the family was a "no show" for a scheduled meeting the week before.

The court held the adjudication hearing on May 30, 2024. A.'s counsel asked the court to sustain count b-1, citing A.'s long history of untreated mental health issues, father's failure to obtain services or medication until very recently, and his continued minimization of the issues by failing to be forthcoming with DCFS. Father's counsel asked the court to dismiss the entire petition. She argued that father's difficulty communicating with the school was due to his work schedule and that the record did not support the allegations that father minimized A.'s issues and failed to seek help. She acknowledged that father "has not been communicating with" DCFS but argued that he "has prioritized action over talking" and had taken all the necessary steps for A.'s care and there was no ongoing risk of harm to A.

7

The court sustained the allegations regarding father's conduct and A.'s mental health problems (count b-1) and mother's abuse of alcohol and endangerment of A.'s half-siblings (count j-1). The court struck the remaining counts b-2 (mother's substance abuse) and c-1 (father's emotional abuse). The court found jurisdiction over A. under section 300, subdivisions (b) and (j).

The court removed A. from mother and ordered her to remain in father's care, with monitored visitation with mother and monthly sibling visits. The court's case plan included counseling for father, psychosocial education, and an order to follow all mental health recommendations for A. The court rejected father's request to close the case, noting that it was "a very serious case, and obviously this child is very disturbed. I'm not just going to let this case go away. . . . We need to make sure this child gets all the services that are available."

Father timely appealed from the court's May 30, 2024 orders.

## IV.  Subsequent Proceedings

DCFS filed an unopposed request for judicial notice of the juvenile court documents reflecting relevant developments in the case while this appeal was pending. We grant that request.

In March 2025, the juvenile court granted father sole legal and physical custody of A. The court then terminated jurisdiction over the matter.

## DISCUSSION

Father argues that the evidence was insufficient to support the juvenile court's jurisdiction findings, because there was no substantial risk of harm to A. at the time of adjudication. DCFS contends the appeal is moot because the juvenile court subsequently terminated jurisdiction and awarded full custody to father. We agree that the appeal is moot and decline to exercise our discretion to reach the merits.

Under the doctrine of justiciability, "[a] court is tasked with the duty "'to decide actual controversies by a judgment which can be carried into effect and not to give opinions upon moot questions or abstract propositions or to

8

declare principles or rules of law which cannot affect the matter in issue in the case before it.”’” (*In re D.P.* (2023) 14 Cal.5th 266, 276 (*D.P.*).)  A case becomes moot when a court cannot render effective relief.  “[R]elief is effective when it ‘can have a practical, tangible impact on the parties’ conduct or legal status.’” (*Id.* at p. 277.)  “A reviewing court must ‘“decide on a case-by-case basis whether subsequent events in a juvenile dependency matter make a case moot and whether [its] decision would affect the outcome in a subsequent proceeding.”’” (*Id.* at p. 276, quoting *In re Anna S.* (2010) 180 Cal.App.4th 1489, 1498.)

In the dependency context, an appeal is not moot where the “juvenile court’s finding forms the basis for an order that continues to impact a parent’s rights—for instance, by restricting visitation or custody.” (*D.P.*, *supra*, 14 Cal.5th at p. 276, citing *In re Joshua C.* (1994) 24 Cal.App.4th 1544, 1548 [reviewing challenge to jurisdictional finding because finding was the basis of order restricting visitation and custody rights].)  Where “reversal of the jurisdictional finding calls into question the validity of orders based on the finding, review of the jurisdictional finding can grant the parent effective relief,” even after the juvenile court has terminated its jurisdiction.  (*D.P.*, *supra*, 14 Cal.5th at p. 277.)  Conversely, where the juvenile court terminates jurisdiction without issuing any order that continues to impact the appealing parent, that parent must show some harm beyond a general complaint of “stigma” to avoid mootness.  (*Ibid.*)  “Although a jurisdictional finding that a parent engaged in abuse or neglect of a child is generally stigmatizing, complaining of ‘stigma’ alone is insufficient to sustain an appeal.  The stigma must be paired with some effect on the plaintiff’s legal status that is capable of being redressed by a favorable court decision.” (*Ibid.*)  “[S]peculative future harm” is not sufficient. (*Id.* at p. 278.)

We agree with DCFS that this appeal is moot.  The jurisdictional finding that father failed to adequately address A.’s mental health needs did not result in any disposition orders adverse to father.  He retained physical custody of A. at all times  and ultimately received full legal and physical custody when the juvenile court terminated jurisdiction in 2025.  In addition,

9

father's briefing identifies no ongoing "tangible legal or practical consequence" resulting from the juvenile court's orders. (*D.P., supra*, 14 Cal.5th at p. 278.) As such, there is no effective relief this court could grant by reversing the challenged jurisdiction finding.

However, even where a case is moot, we have "inherent discretion" to reach the merits of an appeal. (*D.P., supra*, 14 Cal.5th at p. 282.) As our Supreme Court explained, in deciding whether to exercise discretionary review, "courts may consider whether the challenged jurisdictional finding 'could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings,' or "'could have other consequences for [the appellant], beyond jurisdiction.""" (*Id*. at p. 285.) Courts may also evaluate factors such as whether the allegations against the parent are particularly egregious and whether "[p]rinciples of fairness" favor discretionary review. (*Id*. at pp. 284-286.) "Ultimately, in deciding whether to exercise its discretion, a court should be guided by the overarching goals of the dependency system: 'to provide maximum safety and protection for children' with a 'focus' on 'the preservation of the family as well as the safety, protection, and physical and emotional well-being of the child.'" (*Id*. at p. 286.)

Father urges us to exercise our discretion to reach his argument regarding the insufficiency of the evidence supporting count b-1, citing the potential implications between being found an "'offending' parent versus a 'non-offending' parent." (See *In re Andrew S*. (2016) 2 Cal.App.5th 536, 542, fn. 2.) Other than noting this distinction, father gives no further explanation why the findings under count b-1 could impact possible future dependency or family law proceedings involving A., particularly given that father remains the custodial parent. Father's vague assertions here are insufficient to demonstrate that discretionary review is warranted. (See *In re Destiny D*. (2017) 15 Cal.App.5th 197, 209 [The status of a parent as "'offending'" or "'nonoffending'" is not "outcome determinative" and "does not categorically disqualify [a parent] from custody or otherwise limit the court's ability to issue orders necessary to further [the child's] best interest."]; *In re I.A*. (2011)

201 Cal.App.4th 1484, 1495 [dismissing appeal and finding "no threatened prejudice" to father despite his argument that the jurisdiction finding might have some consequence in a future proceeding].) Moreover, the juvenile court's findings that father failed to take seriously A.'s mental health needs do not suggest the sort of "particularly pernicious or stigmatizing conduct" that warrants discretionary review of a moot challenge to a jurisdiction finding. (See *D.P.*, *supra*, 14 Cal.5th at p. 286 ["The more egregious the findings against the parent, the greater the parent's interest in challenging such findings."].)

Under these circumstances, we decline to exercise our discretion to address the substance of father's challenge to the court's jurisdiction findings. We therefore dismiss father's appeal as moot.

## DISPOSITION

Father's appeal is dismissed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:



ZUKIN, P. J.



TAMZARIAN, J.